**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| JOHN DEANE, JR.,<br>    Plaintiff, | No. 3:17-cv-01646 (SRU) |
| v. | |
| AETNA LIFE INS. CO.,<br>    Defendant. | |

**MEMORANDUM OF DECISION**

On September 29, 2017, John Deane Jr. ("Deane") filed this action against Aetna Life

Insurance Co. ("Aetna"), pursuant to Section 502 of the Employee Retirement Income Security

Act ("ERISA") to obtain judicial review of Aetna's denial of long-term disability ("LTD")

benefits under the Covidien Health & Welfare Benefits Plan ("the Plan").  *See generally* Compl.,

Doc. No. 1.  On June 3, 2019, I presided over a bench trial.  *See* Doc. No. 70.  After considering

the evidence in the record, I conclude that Aetna's determination that Deane was not disabled as

defined by the Plan was not arbitrary and capricious.  Therefore, Deane's complaint is dismissed.

**I.      Standard of Review**

   A.  ERISA Bench Trial

         In this case, both parties have agreed to for me to review Aetna's decision through a

bench trial on the stipulated administrative record.  *See* Doc Nos. 35, 36.  The Second Circuit has

held that this is a proper procedure to resolve ERISA benefit disputes.  *See Muller v. First Unum*

*Life Ins. Co.*, 341 F.3d 119, 124 (2d Cir. 2003) ("Since there is no right to a jury trial under

ERISA [a bench trial on the administrative record] was entirely proper.") (internal citation

omitted).  "[A]fter conducting a bench trial, the District Court has an obligation to make explicit

findings of fact and conclusions of law explaining the reasons for its decision."  *Id.*

B.  Arbitrary and Capricious Review

"When an ERISA plan participant challenges a denial of benefits, the proper standard of review is *de novo* 'unless the benefit plan gives the administrator or fiduciary discretionary authority' to assess a participant's eligibility." *Thurber v. Aetna Life Ins. Co.*, 712 F.3d 654, 658 (2d Cir. 2013), *abrogated on other grounds by Montanile v. Bd. of Trustees of Nat. Elevator Indus. Health Benefit Plan*, 136 S. Ct. 651 (2016) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)).  "If the plan does reserve discretion, the denial is subject to arbitrary and capricious review and will be overturned only if it is without reason, unsupported by substantial evidence or erroneous as a matter of law."  *Id.* (internal quotation marks and citation omitted).  "Substantial evidence in turn 'is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [decisionmaker and] . . . requires more than a scintilla but less than a preponderance.'"  *Miller v. United Welfare Fund*, 72 F.3d 1066, 1072 (2d Cir. 1995) (quoting *Sandoval v. Aetna Life & Cas. Ins. Co*., 967 F.2d 377, 382 (10th Cir. 1992)).  Here, there is no dispute that Aetna has fiduciary discretionary authority to determine Deane's eligibility under the Plan.  Therefore, Aetna's decision is subject to arbitrary and capricious review.

## II.    Findings of Fact

On April 23, 2011, Deane suffered severe head and neck injuries after being involved in a serious motor vehicle accident.  Administrative Record ("A.R.") at 753, 1820.  Deane's injuries included a shattered left femur, a torn rotator cuff, and a C7-T1 fracture that required surgery. *See id.*  At the time of the accident, Deane was employed as a "Care Area Specialist" for Covidien PLC, responsible for training medical staff in the use of medical monitoring equipment.  A.R. at 1832.  Soon after the accident, Deane applied for disability benefits under

the terms of the Plan.  *See* Pl's Trial Mem. (Doc. No. 42) at 1.  The Plan contains the following

Test of Disability:

> From the date that you first became disabled and until monthly benefits are payable for 24 months you meet the test of disability on any day that:
>
> - You cannot perform the material duties of your own occupation solely because of an illness, injury or disabling pregnancy-related condition, and
>
> - Your earnings are 80% or less of your adjusted predisability earnings.
>
> After the first 24 months of your disability that monthly benefits are payable, you meet the plan's test of disability on any day you are unable to work at any reasonable occupation solely because of an illness, injury or disabling pregnancy-related condition.

Plan at 8.

The Plan defines "reasonable occupation" as: "any gainful activity:  [f]or which you are,

or may reasonably become, fitted by education, training, or experience; and [w]hich results in, or

can be expected to result in, an income of more than 80% of your adjusted predisability

earnings."  Plan at 25.  The Plan requires a claimant to submit proof of a claim.  "Your claim

must give proof of the nature and extent of the loss.  You must furnish true and correct

information as Aetna may reasonably request.  At any time, Aetna may require copies of

documents to support your claim, including data about employment . . . . Written proof must be

provided for all benefits."  Plan at 20.  Additionally, a claimant will no longer be eligible for

LTD benefits under the Plan if the claimant fails to provide proof that they meet the LTD test of

disability.  Plan at 9.

The Plan also contains the following policy exclusion.  "Long term disability coverage

does not cover any disability on any day that you are confined in a penal or correctional

institution for conviction of a criminal act or other public offense.  You will not be considered to

3

be disabled, and no benefits will be payable."  Plan at 16.  Finally, the Plan contains a clause

granting Aetna discretionary authority to determine a participant's eligibility for benefits.

> **Claim Determinations; ERISA Claim Fiduciary**.  We are a fiduciary with
> complete authority to review all denied claims for benefits under this Policy . . . .
> In exercising such fiduciary responsibility, [w]e shall have discretionary authority
> to determine whether and to what extent eligible employees and beneficiaries are
> entitled to benefits and to construe any disputed or doubtful terms under this
> Policy, the Certificate or any other document incorporated herein.  We shall be
> deemed to have properly exercised such authority unless [w]e abuse our
> discretion by acting arbitrarily and capriciously.

Plan at 59.

On October 25, 2011, Aetna approved Deane's claim for disability benefits.  A.R. at

1927.

> We have reviewed your claim for [LTD] benefits and have determined that, based
> on the information you provided, and according to your policy, you are totally
> disabled from performing the duties of your own occupation.  You are eligible to
> receive monthly benefits effective 10/20/2011, and continuing for up to 24
> months, as long as you remain totally disabled from your occupation.

*Id*.

The October 25, 2011 approval letter advised Deane that "[Aetna] may periodically re-

evaluate your eligibility for benefits by requesting updated medical records from your treating

providers.  [Aetna] will ask about your functionality, restrictions and limitations, the treatment

plan and prognosis for returning to work . . . .  We encourage your cooperation as failure to do so

may have an adverse effect on your benefits."  *Id*.

Throughout 2012, Aetna attempted multiple times to contact Deane seeking updated

medical records and proof of his LTD claim.  *See, e.g*., A.R. at 1959 ("We are in the process of

attempting to obtain information regarding your eligibility for [LTD].  We have attempted to

reach you on July 3, 06, and 12, 2012 . . . .  We have attempted on August 01, 17, 28, 2012 and

[a]lso on September 17 and 26, 2012, along with my last attempt on October 01, 2012.").  Aetna

4

warned Deane that "[i]f we do not hear from you by October 31, 2012 the claim will be reviewed based on the information we have on file which could be termination of benefits." A.R. at 1960. On November 9, 2012, Aetna notified Deane that it was terminating his LTD benefits due to his failure to respond to its multiple requests for information. A.R. at 1969. "Based on the lack of current medical information, we have determined that you no longer meet the definition of Total Disability . . . therefore your case will be terminated as of November 8, 2012." A.R. at 1970.

On or about December 4, 2012, Aetna received a call from Deane's sister, advising Aetna that Deane was incarcerated. A.R. at 622. Deane's sister called to inquire whether Deane's LTD "claim can be denied [because] he is incarcerated." *Id.* Deane's sister called back the following day, stating that she "thinks [Deane] was incarcerated [on] 10/08/2012[,]" that "Deane did not have any priors[,]" and that Deane is "still on pre-trial and [she] [is] not sure how long he will be incarcerated." *Id.* Aetna had no contact with Deane until November 5, 2013, when he sent a letter to Aetna asking when his benefits would start back up. A.R. at 1972. Aetna responded by letter on November 18, 2013, directing Deane to provide documentation regarding his incarceration and "medical documentation from any and all providers" to establish that he remained disabled under the Plan. *Id.*

From 2013 through 2014, Aetna gathered medical evidence to determine whether Deane qualified for LTD benefits after the Plan's requirement for disability benefits transitioned from an inability to perform his "own occupation" to "any reasonable occupation." Pl's Trial Mem. at 5; Def's Trial Mem. (Doc. No. 41) at 5–6. In April 2014, Catherine Barber, R.N. ("Nurse Barber"), reviewed the available medical records and concluded that the evidence "documents treatment for symptoms of neck pain radiating to bilateral upper extremities . . . . Examination documents decreased cervical range of motion, decreased sensation and weakness left hand."

A.R. at 426.  On May 15, 2014 Aetna interviewed Deane as part of an early occupational

assessment.  A.R. at 428–29.  Deane stated that he "[was] having a lot of issues with the neck

and bone pressing on the nerve causing constant numbness of the left hand and forearm [,]" in

addition to "back pain that [was] radiating down the left leg."  A.R. at 429.  Regarding his

functional capacity, Deane stated that he could "drive for 90 minutes but has to stop to rest."  *Id*.

He also told Aetna that he uses a cane because he has trouble walking and that he could do some

housework but has difficulty lifting items over eight pounds.  *Id*.  He also stated that he can sit

for "60 minutes before he has to move."  *Id*.

In June 2014, Aetna received an Attending Physician Statement from Dr. Peter Coveleski

("Dr. Coveleski") who noted that Deane was experiencing pain in his arms, legs, and neck, as

well as depression and anxiety.  A.R. at 1653–56.  Dr. Coveleski reported that Deane could sit

frequently (2.5 to 5 hours), and occasionally (.5 to 2.5 hours) stand, walk, drive, lift, push and

pull.  A.R. at 1654.  In addition, Deane could lift no more than 10 pounds and could never bend

or stoop.  *Id*.  Dr. Coveleski opined that Deane would be able to return to work, on "modified

duty," in four to six months.  *Id*.  Nurse Barber reviewed Dr. Coveleski's report and concluded

that the "[r]estrictions as given by Dr. Coveleski are supported through September 2014" due to

"diagnosis of cervical spondylosis and cervical radiculopathy."  A.R. at 440.

On July 15, 2014, Aetna determined that Deane qualified for benefits retroactively to

December 14, 2013, the day after Deane was released from prison.  A.R. at 1691, 1975.  In its

letter, Aetna advised Deane that it would "continue to request periodic updates to certify [his]

continued disability status."  A.R. at 1975.

That summer, Aetna conducted its own investigation into Deane's incarceration.  A.R. at

467.  Aetna discovered that in 2012 Deane suffered "self-inflicted" injures after an incident with

6

law enforcement.  *Id*.  Aetna also discovered that Deane was incarcerated in Delaware on July 7,

2014.  A.R. at 1980.  After further review, Aetna decided to terminate Deane's benefits on

August 15, 2014.  A.R. at 1979–80.  In its denial letter, Aetna cited the incarceration policy

exclusion under the Plan.  A.R. at 1980.

> We have been made aware you were incarcerated at the Howard R. Young Correctional
> Institution in Wilmington, DE beginning on July 7, 2014.  Per the [] LTD plan provision
> [,] you are not eligible for benefits . . . .We previously issued LTD benefits for the full
> month of July as we were not aware at the time you became ineligible as of July 7, 2014 .
> . . Based on the [] policy exclusion, you are no longer eligible for [LTD] benefits and
> your claim has been closed.

*Id*.

On January 25, 2015, Deane wrote a letter to Aetna inquiring on the status of his

disability claim.  A.R. at 1602.

> I would like to bring to your attention my LTD claim . . . . For almost 7 months of 2014 I
> was trying to get my LTD benefits re-established.  In Aug. 14 I entered a long term
> treatment program for alcohol abuse.  I hope to complete this in patient program over the
> next 90-120 days.  Apparently, I have only received one check for $2,497 . . . . [Why
> have] my benefits checks [] stopped?

*Id*.  Aetna believed that Deane was incarcerated when he wrote his January 25, 2015 letter.  *See*

Def's Trial Memo. at 7.  On November 10, 2015, Aetna re-mailed its denial letter to the address

Deane provided in his letter.  A.R. at 1989–91.

On July 29, 2016, Deane wrote another letter to Aetna, in which he acknowledged that he

was incarcerated from "7/7/14 until 5/4/15."  A.R. at 1564.  He also asserted that he remained

disabled due to injuries from the 2011 car accident and applied to have his benefits reinstated.

*Id*.  Aetna construed Deane's letter as an appeal of its August 15, 2014 decision to terminate

benefits.  A.R. at 2001.  On August 16, 2016, Aetna rejected Deane's appeal as untimely.  *Id*.

"We received the appeal request on August 2, 2016.  The deadline to file an appeal was February

20, 2015.  Because we didn't receive your appeal on time, your claim remains closed and we'll take no other action."  *Id.*

On or about August 1, 2016, Aetna received additional medical records from Deane. A.R. at 1571.  Specifically, Aetna received a January 29, 2016 Attending Physician Statement from Dr. Thuya Aye ("Dr. Aye"), a perfusion clinical specialist.  A.R. at 1576.  Dr. Aye reported that Deane had "ongoing pain" in both legs and his back and needed a "cane for ambulation."  *Id*. Dr. Aye also noted that Deane could not perform any job that required "concentration, pushing, pulling, [or] lifting."  *Id*.  Dr. Aye's "objective findings that substantiate impairment" included: "Limited ROM [range of movement] on lower limb, movement bilaterally."  *Id.*

Aetna also received a July 25, 2016 Attending Physician Statement from Dr. Munir Ahmed ("Dr. Ahmed"), an orthopedic surgeon.  Dr. Ahmed noted that Deane had severe pain and hip instability.  A.R. at 1539.  Dr. Ahmed reported that Deane could sit for "0-5" hours a day and was unable to stand, walk, drive, lift, push or pull, bend or stoop.  *Id.*

After receiving Deane's submissions, Aetna provided him an Appeals Request Form, which he completed on September 30, 2016.  A.R. at 1518–19.  In his appeal, Deane stated that due to his injuries, "[he] is wheelchair bound [and] in severe pain awaiting multiple surgeries to repair [his] legs."  A.R. at 1519.  Deane stated that "not one of my doctors has cleared me to work again."  A.R. at 1518.  Deane also provided Aetna with a list of doctors who had treated him since July 2014.  A.R. at 1520–22.

Aetna continued to receive additional medical information regarding Deane's appeal. Aetna received a report dated November 18, 2016 from a reviewing physician, Dr. David Hoenig ("Dr. Hoenig"), who opined that "as a result of his failed left total knee replacement, right hip arthritis, and chronic let knee pain" Deane could stand and walk less than two hours;

occasionally lift and carry 10 pounds; occasionally bend and crawl; and could never stoop, kneel, crouch, climb, and work around heights.  A.R. at 1180.  Dr. Hoenig also reported that upon his release from prison, Deane "established regular and appropriate care for his conditions within 31 days."  A.R. at 1181.  Dr. Hoenig stated that Deane consulted his primary care physician two weeks after his release, "at which time he reported difficulty with pain."  *Id.*  Dr. Hoenig's findings were largely consistent with opinions from Dr. Aye and Dr. Ahmed.

On or about December 6, 2016, Aetna received a transferrable skills analysis ("TSA") from Maria Pozos ("Pozos").  A.R. 1166–70.  Pozos concluded that Deane could perform two occupations that met the Plan's "reasonable occupation" criteria: (1) Supervisor, Blood Donor Recruiters and (2) Sales Representative, Dental and Medical.  A.R. at 1169.  When constructing the TSA, Pozos considered Deane's previous work as a Care Area Specialist as well as Dr. Hoenig's report.  A.R. at 1166.  She concluded that Deane had the following transferable skills:

> Active Listening, Critical Thinking, Monitoring, Operation Monitoring, Speaking, Reading Comprehension, Judgment and Decision Making, Social Perceptiveness, Service Orientation, Complex Problem Solving, Active Learning, Operation and Control, Coordination, Writing, Instructing, Time Management and Science.

A.R. at 1167.

On December 20, 2016, after reviewing the additional evidence, Aetna notified Deane that it would adhere to its previous decision.  A.R. at 2014–16.  "Your claim for LTD benefits was terminated because you were incarcerated, which is a policy exclusion.  In order for your LTD claim to be reinstated, you needed to meet the test of disability, as outlined below, upon release from prison [ May 5, 2015] through [the] present, and must be unable to perform the material duties of any reasonable occupation."  A.R. at 2014.  Aetna further stated that its decision was based on Deane's medical file, Dr. Hoenig's report, and Pozos's TSA.  *Id.*

On June 16, 2017, Deane, through counsel, notified Aetna that he would file a second appeal. A.R. at 785. In support of his appeal, Deane submitted records from his treating physicians spanning from October 14, 2016 to April 28, 2017. A.R. at 786. He also submitted the results of a June 7, 2017 Functional Capacity Exam ("FCE") conducted by BEST Physical Therapy Associates. *Id*.

Deane's 2017 FCE concluded that he was "unable to perform any substantial gainful activity due to the large discrepancy between his current functions abilities and critical job demands." A.R. at 890. The results further showed that due to the injuries he sustained during the motor vehicle accident, he would be unable to do the following tasks:

> (1) Unable to maintain energy level and reach stamina level required for job duties; (2) unable to achieve muscle strength needed for required duties; (3) unable to sit on more than an occasional basis; (4) unable to perform procedures including average hand coordination, especially on the left, or gripping; (5) unable to negotiate environment independently - push or pull doors open, reach walking speed needed to get through electronic doors, achieve walking speed needed to enter elevators reliably; unable to maintain standing balance, unable to negotiate stairs, inclines, uneven terrain; (6) unable to propel wheelchair adequately to reach needed locations in a timely manner; (7) unable to reliably arise from a seated position and use standard chairs at meetings and conference rooms; (8) unable to sit continuously for prolonged periods; (9) unable to use a computer continuously or any repetitive hand activity for more than approximately 20 minutes; (10) unable to safely negotiate transportation and building exit and entrances at job sites; (11) unable to engage in activities continuously without frequent rest periods.

A.R. at 890–91.

In addition, Deane submitted a report dated June 20, 2017 from Dr. Elizabeth Salcedo ("Dr. Salcedo"), a pain management specialist. Dr. Salcedo opined that Deane could sit no more than 4 hours total; stand/walk for only 0.5 hours (2-5 minutes at a time); lift 5 pounds for less than a third of the workday; required 12 hours of bedrest; required a 30 minute break for every 60 minutes of work; suffered from severe pain that becomes extreme with movement; suffered from daily lapses in concentration/memory; could engage in fine

10

manipulation/writing/grasping/typing for less than a third of the workday, and would be chronically absent.  A.R. at 2460–62.

On July 12, 2017, Dr. Philip Marion ("Dr. Marion") submitted his review of Deane's medical records and concluded that "the restrictions and/or limitations provided by [Deane's] treating providers are not reasonable, supported by observable physical examination or diagnostic testing.  The clinical records do not support the treating providers' claims of [Deane's] reported functional/occupational capacity."  A.R. at 716.  Dr. Marion also discredited Deane's complaints of pain, noting that on June 7, 2017, Deane reported a pain level of 10 out of 10 to his physical therapist, and then the next day did not mention his pain level to Dr. Barry Zimmerman, Deane's treating neurologist.  A.R. at 717–18.

After review of Deane's records, Dr. Marion recommended the following restrictions and limitations: "[Deane's] impairments primarily involve his lower extremities and support restrictions that are mainly seated with brief periods (no more than 2-3 minutes) of standing and walking, occasionally exert up to 10 pounds and frequently reach, handle and finger on a full-time predictable and sustainable basis."  A.R. at 717.  He further stated that "[g]iven Deane's multiple impairments, he should be restricted to mainly sedentary activities."  A.R. at 716.

After receiving Dr. Marion's report, Aetna requested a new TSA, which was completed by Maria O'Brien ("O'Brien") on August 2, 2017.  A.R. at 707–10.  She concluded that Deane had the following transferable skills:

> Active Listening, Critical Thinking, Monitoring, Operation Monitoring, Speaking, Reading Comprehension, Judgment and Decision Making, Social Perceptiveness, Service Orientation, Complex Problem Solving, Active Learning, Operation and Control, Coordination, Writing, Instructing, Time Management and Science.

A.R. at 708

Upon review of the additional evidence, O'Brien concluded that Deane could perform the jobs of (1) Supervisor, Blood Donor Recruiters and (2) Sales Representative, Dental and Medical.  A.R. at 710.  O'Brien noted that those positions were "fair" matches and that there were no jobs available at the "closest" or "good" match level.  *See* A.R. at 708–09.

On August 28, 2017, Aetna notified Deane's counsel that it was dismissing his second appeal.  A.R. at 2057.  "We finished reviewing [Deane's] appeal for [LTD] . . . . We agreed with the original decision to terminate benefits as of August 16, 2014."  *Id.*  The letter explained that Aetna relied on notes from Deane's treating physicians, we well as Dr. Marion's review and Deane's TSA.  A.R. at 2058–59.  In sum, Aetna concluded that "[t]he clinical data failed to support functional impairment that would prevent [Deane] from working at a reasonable, sedentary occupation as of May 5, 2015.  Alternate reasonable occupations have been identified that [Deane] is capable of performing.  As such, [Deane] does not meet the policy provisions noted above and we are unable to recommend an overturn of the termination of LTD benefits effective May 5, 2015."  A.R. at 2060.  As a result, Deane filed this action on September 29, 2017.

## III.   Conclusions of Law

### A.   The Relevant Time Period

The parties agree that under the terms of the Plan, Deane must prove that he was disabled as of May 5, 2015, the day after his release from prison.  *See* Def's Opp. (Doc. No. 43) at 1; *See* Pl's Opp. (Doc. No. 44) at 5.  Deane was incarcerated from June 26, 2014 to July 3, 2014 and then from July 7, 2014 to May 4, 2015.  A.R. at 1579.  Pursuant to the Plan's incarceration policy exclusion, *see* Plan at 16, Aetna no longer considered Deane disabled upon his release.  Therefore, in order to receive LTD benefits, Deane is required to prove that he was disabled as of

May 5, 2015.  Accordingly, I focus my review on the portions of the record that detail Deane's

functional and occupational limitations before, during, and immediately after his 2014 to 2015

term of incarceration.

B. Aetna's Decision was not Arbitrary and Capricious

After reviewing the record, I conclude that Aetna's decision to deny Deane LTD benefits

was not arbitrary and capricious for two main reasons.  First, Aetna's decision was supported by

substantial medical evidence regarding Deane's condition as of May 5, 2015.  Second, Aetna's

reliance on Deane's TSA was not clearly erroneous.  I discuss each in more detail below.

1. Deane's Medical Records

Deane's primary argument is that Aetna acted arbitrarily when terminating his LTD

benefits in the absence of evidence showing that his pain symptoms improved during his

incarceration.  "Aetna agreed that [Deane] was disabled, paid benefits for three years, and only

terminated his benefits in 2014 as a result of his incarceration."  Pl's Mem. at 23.  Deane

contends that his medical records before his incarceration show no signs of improvement. "To

the contrary, the evidence shows that his condition [worsened].  An MRI in February 2014

showed increased foraminal narrowing in his cervical spine . . . . If anything, the evidence

[Deane] has submitted since Aetna decided to deny his benefits is stronger than the evidence that

Aetna found sufficient to award benefits in the first place."  *Id*. at 24.  Deane's pre-incarceration

records, he argues, are consistent with his 2016 and 2017 records, which document his declining

health.  *See id*.

Aetna agrees that Deane's condition deteriorated from 2016 through 2017.  *See* Def's

Opp. at 1.  It argues, however, that Deane "cannot possibly show that it was arbitrary for Aetna

13

to determine that he was not disabled in 2015 by using evidence that concerns only his condition in 2016 or 2017." *Id.*

I agree that evidence detailing Deane's condition in 2016 and 2017 is not determinative. The dispositive question is whether it was arbitrary and capricious for Aetna to deny LTD benefits based on Deane's functional and occupational limitations as of May 5, 2015. Deane's prison medical records from 2014 to 2015 are the most critical pieces of evidence needed to answer that question.

There is no doubt that Deane complained to prison health officials of severe pain in his hip and lower back as a result of his 2011 car accident. Throughout 2014, Deane requested multiple appointments to address his chronic pain. *See, e.g.,* A.R. at 2939 ("SEVERE Right Hip Pain & Right Lower Back Pain . . . . I've put in 4-5 sick calls since Aug. [and] 3 Medical Grievances for the same problem."). On January 25, 2015, Deane described the pain as a "sharp, stabbing pain associated [with] burning in [his right] quad. Normally a 7-8 [out of] 10, sometimes a 10 [out of] 10 [where] I need to sit [and] rest for it to subside." A.R. at 2913. By February 2015, Deane was prescribed Ibuprofen, Naprosyn, and a muscle rub to reduce his pain. A.R. at 2899, 2906, 2995. On February 18, 2015, he was also provided a cane to ambulate more than 50 feet.[1] A.R. at 2906.

Despite Deane's complaints of pain in 2014 and early 2015, treating providers noted that he retained a normal range of motion in his neck and lower extremities. On November 13, 2014, a nurse practitioner noted that Deane had "[p]ain in his left neck" and "[p]ain with internal flexed and straight rotation of [his] leg," but still showed an "[o]therwise normal range of motion" in his neck and normal "[e]xternal movements" with his legs. A.R. 2997. Similarly, on October

---

[1] It is unclear from the records whether Deane was issued a cane to ambulate before February 2015. A note from a nurse on July 23, 2014 shows that Deane requested a cane that summer. *See* A.R. at 3000.

28, 2014, a treating nurse observed Deane with a "steady gait but visible limp."  A.R. at 2098.

The nurse noted that Deane had "[e]qual strength bilaterally in lower extremities."  *Id*.  Those

reports are consistent with the functional restrictions set forth in Pozos's 2016 TSA.  A.R. at

1167.  "Deane can stand and walk less than 2 hours, occasionally lift and carry up to 10 pounds,

he can occasionally bend and crawl, [but] he can never stoop, kneel, crouch, climb or work

around heights."  *Id.*

Prison records from 2015 also indicate that his pain medication was effective.  From

March 2, 2015 until his release on May 4, 2015, there were no reported complaints related to

Deane's hip or back pain other than periodic requests to refill his prescriptions.  *See* A.R. at

2875–2901.  It appears that most of Deane's complaints of severe pain occurred from July 2014

to February 2015, before his pain medication was upgraded.  *See* A.R. at 2995–3009.  In fact,

Deane's latest Sick Call Form reporting pain from his car accident was filed on February 9,

2015, before he was provided with additional pain medication.  A.R. at 2909.  Taken together,

the prison records do not provide a basis to overturn Aetna's determination.

Moreover, Deane's argument that Aetna was required to show medical improvement

before it could terminate his benefits fails under the circumstances of this case.  Deane's benefits

were not cancelled as a result of his medical condition, but rather were terminated because he

was incarcerated.  Under that policy exclusion, Deane was no longer considered disabled as of at

least June 24, 2014.  A.R. at 1579; Plan at 16.  Thus, Aetna was not required under the Plan to

adhere to its initial determination.  It was Deane's burden, not Aetna's, to establish that he was

disabled as of his release date.  Plan at 6, 16; *see also Fitzpatrick v. Bayer Corp*., 2008 WL

169318, at *9 (S.D.N.Y. Jan. 17, 2008) ("To the extent that Plaintiff argues that the past payment

of benefits resulted in a shifting of the burden to the Defendants, Plaintiff is incorrect.  There is

nothing in the caselaw suggesting that the burden of proof shifts to the Defendants if the Plaintiff previously received benefits.") (internal citation omitted).  As discussed above, Deane's records detailing his limited functional capacity from 2016 and 2017 have no bearing on the relevant time period.  Based on the medical records pertinent to Deane's condition on May 5, 2015, there is no indication that Aetna's decision was "without reason, unsupported by substantial evidence or erroneous as a matter of law."  *Thurber*, 712 F.3d at 658.

Deane also argues that Aetna erred by discrediting his reports of pain without performing an in-person examination.  *See* Pl's Mem. at 17–18.  He cites, *Connors v. Conn. Gen. Life Ins. Co.*, 272 F.3d 127, 136 (2d Cir. 2001), for the proposition that a "claimant's complaints of pain must be considered in determining disability and that it is improper to assess a claimant's pain using only a non-examining medical consultant."  Pl's Mot. at 19.  Here, Deane argues that Aetna discredited his reports of chronic pain in favor of Dr. Hoenig's and Dr. Marion's conclusions, both of whom never examined him.  *See id.* at 21.

In response, Aetna argues that it acted within its discretion to rely on the reports of the examining physicians.  *See* Def's Opp. at 11.  "Dr. Marion's peer review provided a detailed and substantive analysis of [Deane's] medical evidence (including the opinions of his treating physicians), and Aetna acted within its discretion in relying on that report."  *Id.*  Moreover, Aetna notes that the Second Circuit does not require an in-person examination of a claimant by the insurer.  *Id.* at 10 (citing *Hobson v. Metro. Life Ins. Co.*, 574 F.3d 75, 91 (2d Cir. 2009) ("Because this court only disturbs a plan administrator's determination if it is arbitrary and capricious, we are unconvinced that the Plan obliged MetLife to conduct an IME; rather, by not ordering such an examination, MetLife simply exercised its discretion to decline to pursue one option at its disposal.").

I conclude that Aetna did not err when evaluating Deane's pain or relying on the examining physicians' conclusions.  First, as Deane concedes, a claimant is not entitled to an in-person examination.  *See* Pl's Mem. at 16 (citing *Hobson*, 574 3d. at 91).  Second, this case is distinguishable from *Connors*.  In that case, the Second Circuit held that it is improper for a district court, on *de novo* review, to "dismiss complaints of pain as legally insufficient evidence of disability."  *Connors*, 272 F.3d. at 136.  Therefore, it is improper for a reviewing court to "discount [] [a claimant's] complaints of pain as merely 'subjective.'"  *Id.*  The *Connors* court noted, however, that "a district court reviewing an administrator's decision *de novo* is not required to accept such complaints as credible."  *Id*.

In its December 20, 2016 denial letter, Aetna explained that its decision was based in part on Deane's "entire claim file" including "all medical records, attending physician statements, and [his] appeal letter."  A R. at 2014.  Aetna also stated that Dr. Hoenig reviewed Deane's records and opined that Deane could "stand and walk less than for 2 hours, occasionally lift up to 10 pounds, occasionally bend and crawl, and never stoop, kneel, crouch, climb, or work around heights."  *Id*.  Similarly, its August 28, 2017 denial letter discussed at length the medical notes of Deane's treating physicians and concluded that "there was no clinical evidence of specific impairment[s] that would have prevented [Deane] from performing sedentary activities on a sustained basis."  A.R. at 2058.  Dr. Marion opined that Deane "would be limited to mainly seated positions, with brief periods of standing/walking, no more than 2-3 minutes.  [Deane] may occasionally exert/lift/carry up to 10 pounds . . . . Considering all of the information, it is reasonable [Deane] has sustained work capacity."  *Id.*

To the extent that Dr. Hoenig's and Dr. Marion's opinions are inconsistent with Deane's Attending Physician Statements, Aetna "may rely on the opinion of independent medical

reviewers despite the fact that such reviewers may not have conducted an examination of the claimant, or may have adopted an opinion that conflicts with those held by the claimant's treating physicians." *Alfano v. CIGNA Life Ins. Co. of New York*, 2009 WL 222351, at *15 (S.D.N.Y. Jan. 30, 2009). Based on the record, there is insufficient evidence to conclude that Aetna's arbitrarily discredited Deane's medical evidence, including his complaints of pain.[2]

    2.  <u>Deane's TSA</u>

Deane also argues that Aetna's denial was arbitrary and capricious because it relied on O'Brien's flawed TSA. In addition to refuting O'Brien's reliance on Dr. Marion's review, Deane contends that many of the "transferable skills" listed in the TSA are merely "aptitudes" that have no bearing on his ability work. *See* Pl's Mot. at 25. "Many of the 'skills' listed [in the TSA], such as 'active listing' and 'judgment and decision making' are not even *skills* at all. Instead, the 'skills' are properly classified as '*aptitudes*' and have no bearing on the transferable skills analysis whatsoever." *Id.*

To support that argument, Deane relies on *Draegert v. Barnhart*, 311 F.3d 468, 477 (2d Cir. 2002), in which the Second Circuit held that an Administrative Law Judge erred in relying on flawed testimony by a vocational expert in a Social Security disability case. In *Draegert*, the vocational expert listed transferable "skills" to include:

> (1) ability to learn and apply rules and procedures, which are sometimes hard to understand [;] (2) ability to use reason and judgement in dealing with all kinds of people[;] (3) ability to think clearly and react quickly in an emergency[;] (4) ability to keep physically fit [;] (5) ability to make conclusions based on facts and on one's personal judgment [;] and [] (6) ability to change easily and frequently from one activity to another.

*Id.* at 476 (internal citations and quotations omitted).

---

[2] As discussed above, Deane's most severe complaints were recorded in medical statements from 2016 and 2017, several months after Deane's release from prison.

The court concluded that those "abilities, when not linked to any particular tasks, are merely traits or aptitudes, not job skills" and where therefore legally insufficient to support the ALJ's decision to deny benefits.  *Id.*  Likewise, Deane contends that the "skills" listed in O'Brien's TSA are aptitudes rather than actual transferable skills.  Pl's Mot. at 26.

Deane's attack on O'Brien's TSA is unavailing.  First, the *Draegert* case is not applicable because it was decided pursuant to the Social Security Administration's regulations and not ERISA.  Second, Deane already possessed many of the "transferable skills" listed in the TSA through his past work as a Care Area Specialist for Covidien PLC.  In that capacity, Deane was responsible for training staff on how to use medical equipment.  A.R. at 1832.  "[Deane] was responsible for providing clinical support throughout the pre-sale, visitation, and post-sales phase.  He also ensured installed monitors were utilized appropriately."  A.R. at 707.  According to the TSA, Deane's transferable skills were obtained "through [his] life experiences" and his past "work history."  A.R. at 708.  Those skills would enable him to work either as (1) a Supervisor, Blood Donor Recruiters or (2) a Sales Representative, Dental and Medical.  A.R. at 708–10.  In addition to the transferable skills listed in the report, O'Brien also stated that Deane had "over 10 years of experience in the medical field plus 6 years of sales experience."[3]  A.R. at 710.  Thus, it was not arbitrary for Aetna to cite Deane's past work history when formulating his TSA.

Finally, Deane argues that O'Brien failed to "acknowledge or incorporate into her opinion the fact that [he] would require a wheelchair, is unable to drive himself, and is prescribed significant pain medication."  Pl's Mot. at 26.  Here, there is no evidence that Deane required a

---

[3] Although Deane contends that the occupations listed in the TSA may require "significant re-training," s*ee* Pl's Mem. at 26, he does not provide sufficient evidence to show that his physical or mental limitations preclude him from acquiring any necessary training to perform those jobs.

wheelchair or was unable to drive himself when he was released from prison in May 2015.  To the contrary, prison records reveal that Deane was using a cane to ambulate and was prescribed Ibuprofen, Naprosyn, and a muscle rub for his pain. A.R. at 2899, 2906, 2995.  In his May 15, 2014 interview, Deane stated he could "drive for 90 minutes but has to stop to rest."  A.R. at 429. Therefore, Aetna did not err in its reliance on the 2016 TSA.

IV.     **Conclusion**

For the reasons stated above, I conclude that Aetna's decision to deny Deane LTD benefits under the Plan was not arbitrary and capricious.  Therefore, Deane has failed to sustain the claim in his complaint.  The Clerk shall enter judgment in favor of the Defendant and close the case.

So ordered.

Dated at Bridgeport, Connecticut, this 21st day of May 2020.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge